Good morning. 118-0047 Kenita Stewart v. Village of Lincolnwood Good morning. May it please the Court. Also, my name is Daniel Martin. I'm here on behalf of the Village of Lincolnwood. The procedural history of this case is that this is an appeal from the Circuit Court for County Decision Judge McGeehan. He reversed the Commission's decision on manifest weight. It is our position that the Commission's decision is correct and should not have been reversed by the Circuit Court. The Commission's decision, in our opinion, is fully supported by the evidence that was presented at trial. The standard of review is whether a reviewing court should be able to reach the same conclusion as the Commission, but whether the opposite conclusion is correctly apparent. In this case, again, the Commission's decision is completely supported by ample evidence. If you look at the facts in this case, it's undisputed that the petitioner, Kenita Stewart, is a police officer. She's driving her own personal motorcycle to work on June 27, 2013. She is allowed to park her motorcycle in a secured area in the police parking lot. She's not required to park there. She can park wherever she wants. There's not a requirement to park in a certain area. She can park at a general parking lot, on the street, wherever else she wants. This is only a benefit to her, so her motorcycle is in a secured area and if there's any rain or winter weather. There's not a benefit to the village of Lincolnwood to park there. Wasn't she authorized by the Chief to use that lot? Yes, she was allowed to use it, absolutely. And was she ever told not to use the lot? No, she was not told not to use it. Other people used it as well. The public didn't use it, did they? I'm sorry? The public didn't use it, did they? No, other police officers. They were allowed to but not required to park there. They could park wherever they wanted. One of the other police officers actually had parked his motorcycle in an alcove by the fire department. We allowed that, yes. Yes. Okay. But it was not, again, a requirement and not a benefit to the village. It's only a benefit to the employee. She could have parked elsewhere. She chose to park there. But if you allow her to do this on a continuing, ongoing basis, can't the argument be made it's part of her employment? For purposes of determining whether the accident arose out of her employment, you're allowing her to do that and she's going along with what is permissible. Well, again, being permissible doesn't mean that it's part of her employment. And if you look at when we talk about how she gets into the parking lot, she's driving her motorcycle through a gate. Riding it. You ride a motorcycle. Okay. Riding a motorcycle through a secured area. As she enters this at a high rate of speed without slowing down, she runs into a stationary bobcat with an oscillating light on the roof. She didn't see, according to her, until it was too late. The testimony of the petitioner is that she had cleared an unobstructed review of the truck and of the bobcat. Let's assume everything you say is true. But the tines, she didn't see that the tines were up. She did not see that. That's right. That's what she testified to. Right. That's what she ran into. As opposed to slowing down or going somewhere else. Excuse me, is negligence a defense in a workers' compensation case? So what difference does it make? What difference does it make? What she was doing may very well have been negligent. But the fact of the matter is that's not a defense to a comp case. It's not negligent, but it's, again, a personal risk from the way she entered the parking lot. Personal risk. Yes, sir. She subjected herself to a personal risk by driving into the parking lot. And that's a defense in a comp case? You got a case that says that? The accident has to arise out of her employment. But you said personal risk was some type of a defense. In order for the case to be compensable, it has to be a risk that's associated or incidental to the employment. Isn't driving in and out of an employer's parking lot part of the – how could that be a personal – how is that a personal risk? It's a personal risk by driving in at this rate of speed without reducing her speed. So negligence is a defense in your opinion? Yes, I think. I'm sorry, he said driving, of course. Yeah, riding. Your argument is nothing more than contributory negligence. That's exactly what your argument is. Nothing more, nothing less. And it's not a defense. Unless you can convince us it's more than one. Yeah. Has she taken herself out by outrageous behavior? Well, I think that we're getting to that point where she doesn't use enough common sense to even slow down, and she drives into this motorcycle, into this bobcat. Again, with the other employees standing there trying to wave her off, telling her not to come through, and she just keeps – Well, do we know how fast she was going? Did somebody say she was going 100 miles an hour? I mean, how does that go out of the realm of negligence? What specific facts make it woeful and wanton here as opposed to merely being negligent? I don't think she was going 100 miles an hour, but I think that the evidence shows that she didn't slow down as she came in. That was a testimony of Mr. Vega, and that's also shown on the videotape. And we would accept that for the record, but is that only negligence? I would say that it would be beyond negligence. Right. If she didn't know that the tines were up, why is it beyond negligence? If those tines hadn't been up, there'd be no accident. If she had slowed down coming in and warned – And you're right. If this were a tort case and we had contributory negligence, her damages would probably be reduced. It's not a tort case. Why is it more than just negligence if she doesn't know that the tines are up? This is one of the factors the commission considered. And they weighed all of the evidence that was presented, and they found that the decision was, again, consistent with what the evidence was. Could they have found that she committed this act intentionally? She intentionally ran into the tines? Could they have found that? Sure, they could have, but there was no evidence. Well, okay, so they couldn't find it. There was no evidence that she intentionally ran into the tines. And if she didn't know the tines were there, how could her action of driving the motorcycle or riding the motorcycle in the area that she rode it be determined to be – the danger would be within her knowledge to such a degree that she would have to be charged with the knowledge of knowing that – of the probable consequences. The commission considered that, and they considered that that was a personal risk, not something that was incidental to her employment. What's personal? Because she was riding her motorcycle, is that what you're saying is personal? How she came into the parking lot and not slowing down, they considered that to be a personal risk. It was not. Well, maybe that wasn't correct. It's either negligence or willful and wanton. It doesn't turn into a personal risk. That's what the commission found. Okay. We also take a look at the fact that she came into work and that this occurred over an hour before her shift was to start. Did she ever come in early before? Is there any evidence in the record that she occasionally came in early? There is evidence that she came in early. So that's true. But there's no evidence as to why she came in early that day. If you look at what the testimony was from Chief Amantia, he testified that she came in early sometimes to socialize, to visit with friends, maybe to work, to work out. But nothing that says why she came in to work early. What did she say? I'm sorry? What did she say? She didn't say. She wasn't asked why she came to work early that day. Would an employer normally punish an employee for coming to work early? That would be a little unusual, wouldn't it? Don't you want employees to be there early rather than late? I think they'd much rather have them there early than late. Okay. But that doesn't necessarily mean just by arriving early that it automatically makes her an enforcer for employment. The commission's decision found that the start of her shift, which she was allowed to do 12 minutes before she started to finish doing paperwork, was necessary. There was no evidence, again, as to why she came in early. And there is no support in the case law. What did Lieutenant Martin say about supervisors coming in early? Supervisors do come in early. Chief Omancita also says other officers come in early as well, again, for a variety of reasons. Nothing in the record tells us why she came in to work early that day. But Martin said that the supervisors are encouraged to come in early. They sometimes come in an hour before and stay after the shift. And what are they doing while they're doing that? Sometimes they're socializing. Sometimes they're working out. Sometimes they're getting ready to start the shift. The village provides for 12 minutes prior to the shift as compensatory time to do the necessary paperwork for a sergeant. If they're going to be where they're staying after the shift because there have been crimes on the street or other factors and they need to stay late, that's approved overtime. In this case, there was nothing that required her or even suggested that she needed to be in early on June 27th. Do you recall testimony that she typically arrived one hour early to talk with previous shift supervisors, check criminal activity reports, obtain criminal history, things of that nature? Yes, I do recall that testimony. And, again, there was testimony that there's a variety of things that can be done and that are sometimes done. But, again, nothing on that day and nothing that necessarily required her to be there that early. That's why the village allows this 12-minute prep time to be coming in from the old shift. So she's an hourly paid employee. Yes. And so your argument basically is that this one-hour arrival before she's on the clock is not reasonable. That's correct. You want to tell me that a police officer is an hourly paid employee? Yes. They don't get a salary? Correct. They get paid by the hour? Yes, sir. And Lincoln, what do you mean? She wanted me to launch a money test about that. So there are contractual employees and the pay rate is based in the bargain for contract on an hourly basis. Correct. And so you've got under the Wage and Hour Act of the State of Illinois, you've got an eight hours, then time and a half and double time concepts. Depending on what the contract says. I don't know what the contract says. The testimony from the chief was that they get 12 minutes of compensatory time before the start of each shift. Wait a minute. He never testified she got paid by the hour. He testified that she could get overtime pay. I believe, Judge, that she did. I don't think so. He testified that supervisors can arrive earlier and request overtime pay in advance if they wish to be compensated is what he testified to. They get paid for eight hour shifts. We understand that. But they're salaried employees. With all due respect, I think that's incorrect. I believe that was testified by the chief that they are hourly employees. They get paid by the hour. Testified that certain tasks, including performance reviews, meeting with tactical officers, might require supervisors to arrive early and request overtime in advance if they wish to be compensated. Claimant had sought overtime in the past, but not for the date of the accident. Chief Lamont did not know why she arrived earlier that day. That was his testimony. I would have to go through the. You can be sure we will. I'm not wasting any more of your time. We'll find it if it's there. So the commission, again, after reviewing all of the evidence, applying it to the law, found that the petitioner did not have an accident which arose out of her employment or in the course of her employment. They weighed all of this evidence. They took it all into consideration. They made their decision. It's our position. The commission was correct. Their decision is amply supported by the evidence and that it should be reinstated. I didn't address at least you'll have time and your time is up right now. How is your client compensated? I'm sorry. I'm just curious. I mean, how do you calculate overtime with a salaried employee? Salary is normally, you know, pay envelope. And you're required to be at work from a particular period. I'm just curious. So, I mean, then it becomes in the course of, I mean, suppose she flew in there with her motorcycle at 1 a.m. Would she be in the course of? So, there is a reasonableness standard. Yes. And I think that it is clear in the case. And there was a case that I cited in my brief as a Supreme Court case. In my Supreme Court case, excuse me. Here in Walker, where an individual had been arriving to work approximately an hour before his shift would start for 24 years. In this situation, we have a highly respected shift supervisor in the Lincolnwood Police Department who had been arriving to work early for at least 14 years. At least that her prior chief, who came in to testify on her behalf, indicated that was her pattern and that was her routine. And she was an upper man. She reported to her former chief Lewandowski. And she was actually encouraged to come in early, as your eyes had alluded to. And Lieutenant Martin also indicated that it was a matter of professional pride for an officer to come in early and do the work that needed to be done. And especially in her position since she was a supervising officer that had many duties. Her own chief, her current chief at the time of the accident, Mama Tia, had testified that he couldn't do justice to all of her contributions to the police department. So I would argue that certainly an hour before for a person in her position is not an unreasonable time period to look at what happened on the shift prior to hers. Talk to those individuals and those shift supervisors. Assign officers their feats. Do all of the sorts of things that have been discussed in the briefs as well as through the testimony as to what her job duties are. She was also a member of the Major Crimes Task Force. You're going to waste a lot of your time on this, should she have been there an hour early. When did you get to the question of whether striking the tines on the machine occurred out of and in the course of her employment? I think that's exactly what takes this case out of the first momentous argument that counsel argues in his case. The parking lot in this situation becomes an extension of her employment. This is an employer-provided parking lot. It is not only provided by them. It's an extension of the employer's premises, isn't it? Yes, but it was also facilitated by them for her to park there when they gave her the garage door opener to be able to access it. Did they give it to her or did a prior employee give it to her? I'm sorry? Did the village give her that device or did a prior employee give it to her? It was a prior supervisor, officer, is my understanding. And even the village obviously knew, it's been task acknowledged, that she was using this parking lot on a regular basis. Nobody had any problem with that. Did they ever tell her not to use it? They never told her not to use it. So now we not only have a parking lot provided by the employer, but we also have a hazard on the parking lot. And I would argue that the site of this construction area, they were taking up grass and putting in brick papers set up right inside the entranceway of this parking lot created a hazard. The two individuals who came and testified, Mr. Rezendez and Mr. Vega, indicated what the scene looked like. And you can see from the video what it looked like. There were no markings that there was a construction going on within that doorway, the entranceway. There were no flags. There were no cones. There were no construction signs. There was no flatter. There was none of those indicators. No reduced speed signs that would indicate there was something going on in this entranceway. And when she drove through, as you indicated, those forks, those tines from the bobcat were two feet off the ground. And that bobcat was stopped. Why would that make any difference whether they were off the ground or tines? Because it's her highway bar from the motorcycle that struck the tines that caused her to fall. And I think that is the gist of this case. Had those tines been down on the ground, she really would have ran over them and we wouldn't be standing here. So I think the hazard created by the tines. She would have run over the tines that are on the pavement, right? Right. That's not a very safe method of travel, is it? No, but it certainly would have caused the situation that she found herself in. Nevertheless, there's no evidence that she knew the tines were elevated. There's no evidence that she deliberately ran into them, is there? Absolutely not. And there was testimony that there was no indication that she had been speeding. There was no tickets issued. There was no disciplinary action. She thinks she's going to get a ticket. Oh, come on. Let's not go that far. We're surprised that that didn't happen. There's no disciplinary measures taken for the way she acted in this incident and what she was doing. Okay, so even if she's arguably negligent, you can make a fairly good argument for that. That has nothing to do with this case, does it? It does not. Negligence is not considered, is it, in this context? No, it's not. Okay. Anything else? Any other questions? Why don't you talk to us about the penalties you want? Why should you be entitled to penalties? This woman was paid her entire salary for all the time she was off. Every dime of her medical bills were paid by the group insurance that was provided by her employer. So why should you be entitled to penalties? I think the purpose of penalties is to deter employers from making decisions in these workers' comp cases. Well, what decision did they make? They paid her 100 percent of her salary. But it was not for workers' compensation. So what? The employer paid it, didn't they? Who's supposed to pay TTD, insurance companies or employers? Well, in this case, it was the village. But in every workers' compensation case, who's obligated to pay TTD? No, the employer. And in this case, the employer didn't pay her two-thirds of her average weekly wage. The employer paid her 100 percent of her average weekly wage. And every one of her medical bills were paid through group insurance. And so I'm at a loss to understand where you can claim you're entitled to penalties. Well, I think, as I stated, I think part of the reason you have penalties is to deter employers from making these decisions without any investigation. What decision? To not pay through workers' comp. What do you mean, not pay through workers' comp? Are they required to pay through workers' comp? Well, there's different things that workers, in terms of, say, medical bills, workers' comp has to pay a fee schedule, for example. Well, there's different requirements. Yeah, when they pay through the group insurance, they get more. I understand. Not less. They get more. You don't want to go so far as to say penalties are discouraged an employer from defending a claim. No, Joe, that's not what I'm saying. I'm just saying that, you know, we have two individuals who come in who work for the insurance company. We want to come in and state that there is no investigation done in terms of reading police reports, interviewing people, looking at a video. No investigation was done in this case to even make a determination of whether this is compatible under workers' comp. And so what? If she got everything she was entitled to, what difference does it make what they did or didn't do? You're parsing out how she got paid. The purpose of the act, is it not, is to compensate or make whole an injured employee. However she is made whole and fully compensated isn't really the issue in the penalties. If it happened, you can't say they should have approached it in a different way. Your argument hinges on that unstated principle, they should have done it in a different way. And he's saying everything, if she got full compensation, what's the difference? I mean, it has to be an unreasonable or vexatious refusal to pay benefits to which she's entitled. What benefits was she entitled to that she didn't get? Can you? You see the argument? I see the argument. Unless she can point out something unique about the benefits coming from one source versus the other, you might want to try that fact. Does it make a difference? Yeah, I think my argument is more towards the employer should not be denying workers' comp benefits in any scenario. Did she ever request workers' comp benefits? I'm sorry? Did she ever request benefits? When we filed an application for Justin McClain. You requested benefits? Through phone calls, yes. It wasn't formal. What did you want the bill to do, stop paying her 100% of her salary and pay her only two-thirds? Is that what you want? Well, there was some medical bills which were eventually paid, but again, I understand the scenario where you're going with this. How this arbitrator awarded the penalties and the attorney's fees that he awarded is a mystery to me. This is a total mystery. He's concerned about the higher purposes of the law. It's like something out of Oz. The deterrent, the higher purposes of the law that we were talking about. But when we put it down in practical, she ended up being made whole and got what she was entitled to, correct? Yes. Okay. All right. Thank you, counsel. Counsel, you may reply. I don't think you have to spend a lot of time on it, you know, considering the direction of things, sir. I don't think I need to spend any time on penalties. You might undo it with an argument, but you're not going to help yourself. You could steal it, steal it. You could snatch victory right out of the jaws of defeat. It's not wrong not to try to fix it. We only have five minutes. Would you like to proceed? I was looking through the record to determine where the overtime fee ended and about the hourly pay we talked about. There was discussion about 12 minutes prep time as compensated. We understand she got paid compensatory time for overtime. Yes. What you said is she got paid by the hour. That's what I believe it is. She got a salary. I do not see that in the record. All of the evidence about how she got her money all relates to her being paid her entire salary. She was not an hourly employee, counsel. It's just wrong. I don't see that in the record. All right. Go ahead. The 12 minutes that she had been paid or allowed to be paid at the start of the shift was what the village believed and the police department believed was needed in order for the employee to begin her shift, not an hour before. And this is something, again, that the commission took into consideration when they made their decision about whether it was a wrong dollar in the course of her shift. Thank you. Any further questions? I believe there are. Thank you, counsel, both. The arguments in this matter will be taken under advisement and a written disposition shall issue.